THE MILK COMMISSION, an Instrumentality of the State, and MRS. J. D. ALDERMAN, MRS. BERTHA M. ELLIOTT, E. A. GILBERT, et al., as Members of and Constituting the said Commission, Petitioners, v. DADE COUNTY DAIRIES, INC., ECONOMY-PROFIT SHARING ASSOCIATION, INC., VINCENT C. GIBLIN and L. A. SCHROEDER, JR., Respondents.

200 So. 83
Division A
Opinion Filed December 20, 1940
Rehearing Denied January 28, 1941

580

582

*Worley & Gautier* and *E. E. Fleming,* for Petitioners;

*Vincent. C. Giblin* and *L. A. Schroeder, Jr.,* for Respondents;

*Emmett C. Choate,* as *Amicus Curiae.*

BUFORD, J.—On petition for writ of certioari we review order granting temporary injunction.

The petition, *inter alia,* alleges:

"That the respondents in the said bill of complaint above referred to alleged, among other things, that the Dade County Dairies, Inc., one of the respondents, is a distributor of milk, operating in the City of Miami, Dade County, Florida, and that Economy Profit-Sharing Association, Inc., operates stores in which milk, cream and milk products are on sale in Miami, Dade County, Florida.

"The bill of complaint further alleges that on August 2, 1940, your petitioners herein, comprising the Florida Milk Commission, caused to be filed, passed and adopted an order which is a part of the transcript of record herein, known as Order Number 22-38, which order was passed by the Florida Milk Commission, and the effect of which was to prohibit any and all persons whomsoever from trafficking in milk

bottles or containers and prevent rebates through the re-purchasing of milk bottles from consumers in order that no person dealing in milk, whether distributor, storekeeper or otherwise, should pay any moneys for the return of any milk bottles or containers above or in addition to the sum charged as a deposit for said milk bottles or containers at the time said bottle was delivered to the consumer or consumers filled with fluid milk or milk products. The said order contained other provisions tending to regulate traffiking in milk bottles, which your petitioners deemed necessary in order to eliminate unfair and unethical trade practices in the milk industry, all of which will be readily observed by reading the order which is a part of the certified copy of the transcript of record filed herein.

"The bill of complaint after setting further various and sundry reasons for the illegality of said order, prayed that an injunctive order be entered, wherein your petitioners would be restrained from attempting to enforce or effectuate provisions of the said order 22-38, and that upon final hearing the injunction or restraining order be made permanent.

"And petitioners further show unto the Court that after due notice, the said bill of complaint came on for hearing and application for temporary order on the 14th day of August, 1940, at which time oral motions were filed before the Court to dismiss the said cause and an additional motion to stay the proceedings, said motions being later reduced to writing and filed before the Court on the 15th day of August, 1940, a copy of the said motions being a part of the certified copy of transcript of record herein.

"The bill of complaint alleges, among other things, that under and by virtue of Chapter 19231, Laws of 1939, which Act created the Florida Milk Commission, the language of said Act required a public hearing before an order such

as Order Number 2238 could be legally passed and adopted by the Florida Milk Commission, and further alleges that said order is null and void and of no force and effect because the same is unreasonable, arbitrary, capricious, unfair and discriminatory, and for the further reason that said order would be violative of provisions of Section 1 of Article XVI of the amendments to the Constitution of the United States and also the provisions of Section 12 of the Declaration of Rights of the Constitution of the State of Florida, and would deprive the respondents and each of them without due process of law, of the liberty and freedom of contract guaranteed to them by the Constitution under the provisions above mentioned."

Motion to dismiss was entered and overruled and, after hearing, temporary restraining order was granted.

The Order No. 22-38 of the Milk Commission complained of is lengthy and it is only necessary for us to quote the provisions thereof the enforcement of which are restrained. They are:

"FURTHER ORDERED, in order to prevent confusion on the part of the general public as to the products that they are purchasing, and in order to assist enforcement officers of the State of Florida and the municipalities in said area in enforcing the sanitary regulations affecting milk in said area, and in order to assist in the prompt return of bottles sold through stores to the bona fide owner thereof, that whenever any milk distributor, dealer or store-keeper sells any milk in bottles or other containers to a retail consumer of such milk, the same shall be sold only in a milk bottle or container which contains a label or mark of a permanent character, either printed or blown, imprinted or otherwise permanently affixed to such bottle, can or container, which name or imprint shall plainly indicate the person, firm or

corporation who has bottled or otherwise packed said milk. for ultimate sale to the consuming public; and it is

"FURTHER ORDERED that no milk distributor dealer or storekeeper who handles milk or milk products shall sell any milk to a member of the consuming public in any bottle, can, case or other container except the same be so labeled or marked as above provided; and it is

"FURTHER ORDERED that no dealer or storekeeper or distributor shall pay any sum or sums of money whatsoever for the return of any bottle, can or other container commonly used as a milk receptacle, except such sum as such distributor, dealer or store-keeper shall have required in advance for a deposit upon such bottle, can or container at the time that said milk was sold to the consumer . . . And it is

"FURTHER ORDERED that no person, firm or corporation engaging in selling milk, cream or milk products as a dealer, distributor, or storekeeper, shall promise or agree, or permit any of its agents, servants or employees to promise or agree with any person, firm or corporation buying milk for consumption, to re-purchase or to have any other person, firm or corporation to re-purchase bottles, cans, or containers in which such milk, cream or milk-product is sold to any consumer at any price, except such distributor, dealer or storekeeper may agree to return to such consumer upon the return of any bottle, can or other receptacle, that sum of money that may have been deposited in advance by such consumer at the time of the purchase to insure the return of such bottle, can or receptacle; and it is

"FURTHER ORDERED that no distributor, dealer or storekeeper or any other person engaged in the sale or distribution of milk, cream or milk products in said area shall in anywise advertise the price of milk, cream or milk products

below the established price fixed in said area by the Commission, either by way of rebate or by any method of repurchase of bottles, cans or receptacles, or by any scheme or offer which would indicate that the ultimate price for the milk, cream or milk products would be lessened below the price fixed by the Commission, by virtue of the return of any bottle, can or other receptacle which might again be used in the industry, or by way of any other method or exchange, it being considered by this Commission that the advertising of milk below the price fixed by the Commission, or the display of figures indicating that the ultimate cost of said milk would be below said price, constitutes unfair trade practice, and tends to encourage rebates and other unfair trade practices. . . . And it is

"FURTHER ORDERED that every person, firm or corporation dealing in milk shall in no instance sell or dispose of, or give away, any bottle, can or receptacle containing milk, cream or milk products to any consumer at the time said milk, cream or milk product is sold to said consumer, it being considered by this Commission that such a sale or parting of title with such bottle, can or container by sale or gift, is in effect a discount or rebate to said consumer, or may be used as a method of giving discounts contrary to the provisions of the laws of the State of Florida, providing that no method or device shall be employed whereby milk is sold or offered to be sold, at a price less than the prices established in said area."

Three questions are presented in the briefs for our consideration, stated as follows:

1. "It Order No. 22-38 passed and adopted by the Florida Milk Commission, which regulates deposits to be made upon milk bottles and which prohibits dealers and distributors, their agents, servants and employees from re-

purchasing said milk bottles from their respective customers; void because no public hearing was held prior to its passage and adoption?"

2. "Is Order No. 22-38 passed and adopted by the Florida Milk Commission, being involved herein, and which regulates deposits to be made upon milk bottles and which prohibits dealers and distributors, their agents, servants and employees, from purchasing milk bottles from their customers, void because it is unreasonable, arbitrary, capricious and discriminatory?"

3. "Will injunction lie against the Florida Milk Commission where no injury is alleged or proven by the plaintiffs except that they anticipate their cost of doing business may be increased if the provisions of Order No. 22-38 are enforced?"

In addition to these questions the appellee at the bar of this Court challenges the constitutionality of Chapter 19231, Acts of 1939, upon certain grounds, only two of which we think present sufficient merit, in the light of our opinion and judgment in the case of Miami Home Milk Producers v. Milk Control Board, 124 Fla. 797, 169 So. 541, to require us to discuss it here. The questions thus presented are:

1. "Is Chapter 19231, Laws of Florida, 1939, which Act created the Florida Milk Commission, invalid or unconstitutional because of the fact that in Section 4 of said Act, which relates to the general powers conferred by the Legislature upon the Milk Commission, it is provided in Subsection (a) thereof: That the Commission shall not supervise or regulate any natural marketing area except upon petition of a group of representative producers who petition the Commission to invoke the provisions of this Act?". .

2. "Is an order duly passed by the Milk Commission regulating the prices of milk, unconstitutional, void and

unenforceable because of the fact that the same is an unlawful delegation of legislative authority, due to the fact that said order is operative in only one area created by the Commission as to the prices fixed in said order, on the theory that the said order has the effect of being a legislative Act, but is in effect a local or special Act, and would, therefore, be violative of Article III, Section 21, of the Constitution of Florida, which provides for the passage of special or local laws enacted by the Legislature?"

We shall first dispose of the challenge to the constitutional validity.

Paragraph (a) Section 4 of the Act provides, *inter alia:*

"(a) To supervise and regulate the entire milk industry of the State of Florida, including the production, transportation, manufacture, storage, distribution, delivery and sale of milk, cream and milk products in any market established by the Commission in the State of Florida; provided, however, that nothing contained in this Act shall be construed to abrogate or effect the status, force or operation of any provision of any law relating to public health or sanitation, the purity of food products (the public health law, the public service law, the State Sanitary Code), milk products law, except as provided for in Subsection 4 of Section 9 of this Act, State ice cream law, or any local health ordinance or regulation; and provided, further that the Commission shall not supervise or regulate any natural marketing area except upon petition of a group of representative producers who petition the Commission to invoke the provisions of this Act as herein provided, and provided further that nothing in this Act shall give the Commission power to make rules or regulations prohibiting the giving away gratis of milk or milk products in cases of charity."

A provision of Section 5 of the Act is:

"The posting in the main office of the Commission of any rule, and of any order not herein required to be served, and such filing in the office of the Secretary of State, shall constitute due and sufficient notice to all persons affected by such rule or order. A rule of the Commission when duly posted and filed as provided in this Section shall have the force and effect of law. The provisions of this Section as to service of orders shall not apply to orders fixing prices of milk as to which provision is made in Section 13 of this Act."

The challenged provision of paragraph (a), Section 4, *supra*, is:

"And provided further that the Commission shall not supervise or regulate any natural marketing area except upon petition of a group of representative producers who petition the Commission to invoke the provisions of this Act as herein provided."

It will be observed that this provision of the statute confers no power or duty upon "a representative group of producers" but merely limits the exercise by the Commission of the powers and duties reposed in the Commission to areas in which such a "group" may petition for the exercise of such powers and duties. It leaves the discretion and determination of the necessity of the establishment of the control area entirely with the Commission. It simply precludes the Commission to assume jurisdiction where there is no expressed desire on the part of any "group of producers" to have exercise of such jurisdiction initiated.

It is contended that the words "representative group" are so vague, indefinite and uncertain as to invalidate the provision. We do not agree with this contention. Whether or not the petition is presented by a "representative group" is a matter for the Commission in its discretion to determine.

It is too well settled to question that if the Commission arbitrarily abuses its discretion its action in such regard may be reviewed by the courts. The question as to whether or not a representative group of producers has petition for the initiation of the exercise of the jurisdiction of a Commission in an area is a matter which may be determined by the Commission based upon evidence presented at a hearing had and in which the Commission after notice, as provided for in the Act, determines the question as to whether or not a milk control area, or market, should be established.

It appears that it is not necessary for us to go beyond our own jurisdiction to determine the validity of this provision of the Act. In Richardson, *et al.*, v. Baldwin, 124 Fla. 233, 168 So. 255, we said:

"It is settled law that the Legislature cannot delegate the power to make a law or to declare what law is or to exercise an unlimited discretion in applying the law. It may enact a law complete in itself to accomplish a public purpose and may authorize designated officers within definite limitations to prescribe rules and regulations for its enforcement. Such laws are upheld on the theory that the power to make rules is not exclusively legislative but essentially administrative and necessary to the complete administration of the law. Bailey v. Van Pelt, 78 Fla. 337, 82 So. 789; State Plant Board v. Robers, 71 Fla. 663, 72 So. 175; Butterfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525; United States v. Crimaud, 220 U. S. 506; 31 Sup. Ct. 480, 55 L. Ed. 563."

In *Ex parte* Lewis, 101 Fla. 624, 135 Sou. 147, the validity of Section 71 (a) of Chapter 13644, Acts of 1929, was under attack. It was contended that the power there conferred on various boards of county commissioners was.

a legislative power and could not be so delegated. We held against that contention, and, *inter alia,* said:

"In this case the Court judicially notices the fact that the purpose of a closed season on fishing in the fresh waters of the State is for conservation of the fish by affording the fish an opportunity during the closed season to replenish themselves without molestation from sportsmen. The season during which this restriction is required to be placed for the purpose of conservation varies in different waters and in different localities, and in some waters and in some localities the necessity for a closed season does not exist at all, as every one commonly knows.

"So construing Section 71A of Chapter 13644, *supra,* as having been enacted for the conservation of fresh-water fish, and as having for its purpose and object the setting apart in each year of a period of not exceeding sixty consecutive days during which fishing shall be prohibited for the better protection of the fish, we have a statute which measures up to the rule laid down by this Court in the case of Bailey v. Van Pelt, 78 Fla. 337, 82 So. 789, 793, where it was held:

" 'The Legislature may not delegate the power to enact a law, or to declare what the law shall be, or to exercise an unrestricted discretion in applying a law; but it may enact a law complete in itself, designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose. This principle of the law is peculiarly applicable to regulations under the police power, since the complex and ever-changing conditions that attend and affect such matters make it impracticable for the Legislature to prescribe all necessary rules and regulations.'.

"See State v. Atlantic Coast Line R. Co., 56 Fla. 617, 47 So. 969, 32 L. R. A. (N. S.) 639.

"Complex and variant conditions that affect the taking of fish in our fresh waters are known to have made it impracticable for the Legislature itself to intelligently and fairly deal with the subject of closed fishing seasons directly in each locality by naming the particular time of the closed season in the statute. Experience with a myriad of such previous legislative attempts has undeniably so demonstrated. "But the power to enact a law closing fresh waters in the county for a certain season is not delegated to the county commissioners, because the declaration of the policy of a closed season is found in the terms of the statute itself. Nor is there any unrestricted discretion delegated to them to apply the law, because that discretion which, if delegated at all, is delegated to be exercised only in a restricted way and for a restricted time. This restricted way is by resolution adopted in a particular manner, promulgated in a particular manner, limited to a period of not exceeding sixty days and not subject to repeal when once adopted and put into effect."

Further quoting from Hampton, Jr., & Co. v. United States, 276 U. S. 400, 48 S. Ct. 348, 351; 12 L. Ed. 624, we said: "The true distinction, therefore, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made." To which quotation may be added another from the same opinion: "Congress may feel itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future con-

ditions, and it may leave the determination of such time to the decision of an executive."

In the case of Currin, *et al.*, v. Wallace, 306 U. S. 1, 83 L. Ed. 441, the Court had under consideration the validity of the Tobacco Inspection Act of August 23, 1935. The opinion states:

"The Secretary is authorized to designate those markets where tobacco bought and sold at auction or the products customarily manufactured therefrom move in commerce. He is not to designate a market unless two-thirds of the growers, voting at a prescribed referendum, favor it. The Act provides that after public notice that a market has been so designated, that no tobacco shall be offered for sale at auction thereon until it has been inspected and certified by an authorized representative of the Secretary according to the established standards. There is a proviso that in case competent inspectors are not available or for other reasons the Secretary is unable to provide for such inspection and certification at all auction markets within a type area, he shall first designate those markets where the greatest number of growers may be served with the facilities available."

Mr. Chief Justice Hughes, in delivering the opinion for the Court, said:

"The argument that there is an unconstitutional delegation of legislative power is equally untenable. This is not a case where Congress has attempted to abdicate, or to transfer to others, the essential legislative functions with which it is vested by the Constitution. Art. I, No. 1, 8, 18. See Panama Ref. Co. v. Ryan, 293 U. S. 388, 421, 79 L. Ed. 446, 459, 55 S. Ct. 241; A. L. A. Shechter Poultry Corp. v. United States, 295 U. S. 495, 529, 541, 553, 79 L. Ed. 1570, 1579 1586 1587 1592 55 S. Ct. 837 97 A. L. R. 947. We have always recognized that legislation must often be adapted

to conditions involving details with which it is impracticable for the Legislature to deal directly. We have said that 'The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility.' Panama Ref. Co. v. Ryan, 293 U. S. 388, 79 L. Ed. 446, 55 S. Ct. 241, *supra*. In such cases, a general provision may be made, and power given to those who are to act under such general provisions to fill up the details.' Wayman v. Southard, 10 Wheat. 1, 43, 6 L. Ed. 253, 262. We think that the Tobacco Inspection Act belongs to that class.

"So far as growers of tobacco are concerned, the required referendum does not involve any delegation of legislative authority. Congress has merely placed a restriction upon its own regulation by withholding its operation as to a given market 'unless two-thirds of the growers voting favor it.' Similar conditions are frequently found in police regulations. Thomas Cusack Co. v. Chicago, 242 U. S. 526, 530, 61 L. Ed. 472, 475, 37 S. Ct. 190, L. R. A. 1918A, 136, Ann. Cas. 1917C, 594. This is not a case where a group of producers may make the law and force it upon a minority (see Carter v. Carter Coal Co. 298 U. S. 238, 310, 318, 80 L. Ed. 1160, 1188, 1192, 56 S. Ct. 855) or where a prohibition of an inoffensive and legitimate use of property is imposed not by the Legislature but by other property

owners (see Washington *ex rel. S*eattle Title Trust Co. v. Robergé, 278 U. S. 116, 122, 73 L. Ed. 210, 214, 49 S. Ct. 50, 86 A. L. R. 654). Here it is Congress that exercises its legislative authority ·in making the regulation and in prescribing the conditions of its application."

While it is true that in the last cited case the requirement of the statute was that the market should not be established without a two-thirds vote of the producers in a referendum election we do not think that there was any magic or particular weight to be given to that specific provision. It just happened that that was the condition upon which the legislative body, the Congress, thought wise to adopt. So far as the legality of such provision is concerned, we see no reason why some other reasonable requirement could not have been as valid, if adopted, as was this particular provision because, as the court held, in neither case is there any delegation of legislative power, nor is the control area established by the initiative action either of two-thirds of the producers voting in one case or a representative group petitioning in the other.

This brings us to the second question challenging the constitutionality of the Act.

The challenge is grounded upon the theory that when the Commission by the promulgation of its orders in that regard establishes a milk control area it, in effect, accomplishes the enactment of local legislation. The premise or ground is erroneous and, therefore, a correct conclusion cannot be reached based thereon.

The legislative Act here challenged is a general law and its provisions become applicable to various areas as and when the Commission determines in conformity with the provison of the statute that the statute should be enforced in that particular area.

In Bailey v. Van Pelt, 78 Fla. 337-353, 82 Sou. 789, we had under consideration Chapter 7345, Acts of 1917, and we held that Act to be a general law that could be put into effect in any county in the State by the vote of the electors at a special referendum election.

To the same effect was our holding in *Ex parte* Lewis, *supra,* and such is necessarily the rationale of our holding in Home Milk Producers v. Milk Control Board, *supra,* in which we held that the Milk Control Board under the 1935 Act possessed the power to fix the price of milk in various control areas of the State. The establishment of a market or control area in Dade County, or in any other county of the State, is an administrative function to be accomplished pursuant to the general law and in no sense a local or special law as contemplated under the provisions of Section 20 or 21 of Article III of the Constitution.

Reverting now to question No. 1 we find that paragraph (h) of Section 4 of the Act provides:

"(h) To prohibit the using, buying, purchasing, selling, offering for sale, disposal of, or trafficking in any milk and/or cream bottle, can or container, by any person, firm, or corporation, junk dealer or second-hand dealer other than the owner or his duly authorized agent; a violation of this provision is hereby expressly declared to be unlawful and to constitute a misdemeanor.

"When any milk and/or cream bottle, can or container shall have stamped thereon the name, trade-mark or design of some particular person, firm or corporation, the same shall be deemed *prima facie* evidence of ownership in the person, firm or corporation whose name, trade-mark or design shall appear thereon.

"Possession by any person, firm or corporation, junk

dealer or second-hand dealer other than the owner or his duly authorized agent, of any milk and/or cream bottle, can or container bearing the name, trade-mark or design of such owner shall be deemed *prima facie* evidence of violating the provisions of this Act, unless such person, firm, corporation, junk dealer or second-hand dealer shall have been the purchaser of the contents of the said milk and/or cream bottle, can or container, or shall have exchanged one of his own milk and/or cream bottles in due course of distribution of milk to his trade."

Paragraph (hh) of Section 4 of the Act authorized the Commission,

"To make, adopt and enforce all rules, regulations and orders necessary to carry out the purpose of this Act; to hold hearings after reasonable notice thereof has been given; to receive sworn testimony and evidence at such hearings as to the reasonableness of any order, rule or regulation of the Commission; to reasonably classify and establish definite market areas and to provide different rules, regulations and charges therefor; to establish health and sanitary requirements. The Commission after public hearing and investigation may fix the prices to be paid producers by distributors, milk dealers or producer-distributors in any market or markets; may fix the minimum and maximum wholesale and retail prices to be charged for milk in any market, and may also fix different prices for different grades of milk; may establish the grades of milk; may establish reasonable rules and regulations for fair competition, and fix reasonable rules and regulations for the conduct of the Commission's business and for the regulation of its employees; may require reasonable examinations of license applicants to test their general fitness to engage in any business defined herein; may establish rules and regulations

for hearing in keeping with the procedure herein authorized; may revoke, suspend or refuse to issue the license of any person, firm or corporation hereunder for the violation of any rule, regulation or order of the Commission, after due notice and a fair hearing as herein provided; may provide for the collection of license fees herein authorized and may regulate all matters reasonably incidental to the general or specific powers herein recited; may provide for deputy administrators in any market area created by the Commission, with such authority as may be designated by the Commission, including the power to investigate complaints, report violations of the Commission's orders, and to have such other powers reasonable or incidental thereto, including the right to administer oaths, make investigations, conduct hearings when ordered by the Commission, and on due notice to take testimony in connection with investigations of complaint, and to cause the same to be stenographically transcribed and reported and transmitted to the Commission for final action thereon, together with such other authority as the Commission may designate in keeping with the general powers and purposes created under this Act."

Our construction of this paragraph of the Act is that after the Commission has held the hearing pursuant to reasonable notice thereof and has received the sworn testimony and evidence at such hearing to reasonably classify and establish definite market areas, it may establish market areas and fix the prices to be paid producers and distributors and, amongst other things, may establish reasonable rules and regulations for fair competition. As we construe the paragraph, it specifically authorizes the Commission to adopt and enforce all rules and regulations and orders necessary to carry out the purposes of the Act when an area pursuant to public hearing has been established as a control area. It

is not required after an area has been established that the Commission give notice of a hearing before assuming to promulgate rules and regulations to make effective the provisions of paragraph (h) of Section 4, *supra,* but that such order, rule, or regulation may be promulgated without notice under the statutory authority contained in paragraph (hh), *supra,* where it is declared that the Commission has the power "to make, adopt and enforce all rules, regulations and orders necessary to carry out the purposes of this Act," and that the rule, order or regulation herein complained of was specifically for the purpose of carrying out the provisions of paragraph (h), Section 4.

We must answer Question No. 2 in the negative because we do not construe the rule complained of as being unreasonable, arbitrary, capricious or discriminatory.

The record shows that paragraph (e) of Section 13 of the Act provides:

"After the Commission shall have fixed prices to be charged or paid for milk in any form included in the definition of milk as used in this Act, whether by class, grade or use, it shall be unlawful for a milk dealer to sell or buy or offer to sell or buy milk at any price less or more than such price or prices as shall be applicable to the particular transaction and no method or device shall be lawful whereby milk is bought or sold or offered to be bought or sold at a price less or more than such price, or prices as shall be applicable to the particular transaction, whether by any discount, or rebate or free service, or advertising allowance or a combined price for such milk together with another commodity or commodities, or service or services, which is less or more than the aggregate of the prices for milk and the price or prices for such other commodity or commodities

or service or services, when sold or offered for sale separately or otherwise."

The record shows that the plaintiffs in the court below had inaugurated a system under which they sold milk in bottles at the commission-fixed price of sixteen cents (16c) per quart delivered to the customer in the bottle and that they agreed to pay three cents per bottle to the purchaser, or to anyone else, returning their bottle or an unmarked bottle.

An officer of the complaining company, being one of the complainants herein, also testified at the hearing in response to a question propounded, as follows:

"Q. You have advertised, I believe, that if they will come to your store, the general public, and buy milk, that you will show the general public a method by which they can purchase milk at thirteen cents a quart, net to the purchaser?

"A. We put ads in the Miami Herald from time to time, reading substantially as follows: 'Buy your milk from Economy Profit-Sharing Association, Inc. Visit any of our stores listed below and we will show you how you can procure milk at a net cost of thirteen cents per quart, and other milk products at correspondingly low prices.'"

The record clearly shows that the plan adopted by the complainants contemplated the repayment to the purchaser of each quart of milk the sum of three cents upon the return of the bottle.

If under this plan the title to the bottle passed to the purchaser of the milk then the vendor or distributor was selling the quart of milk and a bottle for 16 cents which was a violation of the statute and the rule, because the milk was being sold for less than the Commission-fixed price in that area, to-wit: less than 16 cents per quart. If the title

did not pass, then the vendor, or distributor, was selling the milk at the Commission-fixed price of 16 cents per quart and loaning the customer the bottle with an agreement to give him a rebate of three cents if and when he returned the bottle, which was also a violation of the statute and of the rules. If the operation of a plan like this is lawful then the price-fixing provision of the statute can not be enforced. One vendor or distributor of milk could pay his customers two cents for each bottle returned, another can cut the price of milk by paying three cents for the bottle returned; another can further reduce the price of milk by paying four cents for the bottle returned and still another could further cut the price of milk by paying five cents for the bottle when returned, etc. We can see no difference between the results under a plan by which vendor or distributor of milk pays the customer the stated price for the return of the bottle and the results under the plan which was condemned by the New York Court in the case of Negbia v. New York, 78 L. Ed. 940, 291 U. S. 502, 54 S. Ct. 505.

In the instant case there was a rebate called the repurchase of a bottle. In the New York case there was a bonus of a five-cent loaf of bread with each two quarts of milk.

The third question must be answered in the negative.

The anticipated increase in costs of the plaintiff's business operations by reason of the enforcement of the rule is necessarily uncertain and problematical. The rule does not prohibit the distributors or other vendors of milk requiring a deposit to guarantee the return of the bottles. This is a general practice indulged in throughout the country and because it is known to all informed people so to be, this Court may take judicial cognizance thereof.

In a suit to enjoin a Board of Commission in the per-

formance of its regulatory duties and functions on the ground that the enforcement will cause the relator irreparable injury the facts stated must be such as to satisfy the court that such Board or Commission is not only exceeding its lawful jurisdiction but that the apprehension of irreparable injury is well founded. See Mayor and City Council of Baltimore, *et al.*, v. Sockett, *et al.*, 135 Md. 56, 107 Atl. 557.

It must be conceded that an administrative board may not be restrained from enforcing an order made within its jurisdiction, the violation of which would constitute a violation also of a valid statute.

For the reasons stated, the writ of certiorari is granted and the challenged order of the circuit court is quashed.

So ordered.

WHITFIELD and THOMAS, J. J., concur.

CHAPMAN, J., agrees to conclusion.

BROWN, J., dissents.

## ON PETITION FOR REHEARING

PER CURIAM.—On petition for rehearing it is submitted among other things that in determining the constitutionality of Chapter 19231, Laws of Florida, Acts of 1939, the Court answered questions not involved in this case. It is further contended that the order of July 12, 1940, as it appears in the record was not adopted by the Milk Board.

The record of the Milk Board shows that it was adopted on July 12, 1940. There is some parol evidence in the record which, if it were admissible for the purpose, would establish the fact that the order was in fact not adopted on that date but we consider the record as filed in the office of the Secretary of State the paramount proof of this question as long as it stands as the record of that proceeding and

the case record does not show evidence of equal dignity that that record so filed in the office of the Secretary of State is false.

As to the question of the constitutionality of the Act: When this case came on for hearing there was the case of Mrs. J. D. Alderman, *et al.*, members of and constituting the Milk Commission of the State of Florida, v. Puritan Dairy, Inc., *et al.*, which case was argued just before the instant case was argued and in that case the two questions quoted in our opinion as to the constitutionality of the Act were the questions presented and it was our distinct understanding that while counsel for the respondents in the instant case had not raised the question of the constitutionality of the Act in the case of Dade County Dairies, Inc., a decision in the case of Puritan Dairy, Inc., et al., holding the Act unconstitutional on the grounds urged would necessarily dispose of the instant case by a decision favorable to the appellee. As the question of the constitutionality of the Act was then definitely before the Court for decision we deemed it expedient to determine that question before proceeding with the determination of other questions presented in the instant record and on this point the briefs filed in the case of Puritan Dairy, Inc., *et al.*, were considered along with the briefs in the instant case.

Petition for rehearing has been carefully considered and is denied.

TERRELL, WHITFIELD, BUFORD and CHAPMAN, J. J., concur.

BROWN, C. J., and THOMAS, J., dissent.

BROWN, J. (dissenting).—I think a rehearing should be granted in this case.

THOMAS, J., concurs.