## ADAMS, et al v. MILK COMMISSION, et al.

Circuit Court, Leon County.

October 4, 1955.

Bedell & Bedell, Jacksonville, for plaintiffs.

Robert L. Casey, Miami, and James C. Gwynn, Tallahassee, for the commission.

Richard W. Ervin, Attorney General, and Ralph M. McLane, Assistant Attorney General, for the Attorney General, intervenor.

HUGH M. TAYLOR, Circuit Judge.

On September 19, 1955 the Florida Milk Commission entered a series of orders suspending all orders then in effect fixing minimum prices for the sale of milk in Florida. In this proceeding more than 100 milk producers and/or distributors seek a decree declaring the orders of September 19, 1955 invalid, and application has been made to the court for a temporary injunction restraining the enforcement thereof until final hearing of the case. The Attorney General has intervened on behalf of the public and argues in opposition to the relief sought.

At the hearing on application for temporary injunction it developed that the proper decision of the case would be governed by decisions on questions of law which had been thoroughly argued and briefed. Whereupon, by consent of the parties, the Attorney General made an oral motion to dismiss the complaint, which was granted in a decree entered on September 30, 1955. The court having been requested to state reasons for the conclusions announced in that decree, this opinion is filed for that purpose.

The case is controlled by a proper construction of chapter 501, Florida Statutes 1953. The questions presented may be stated as follows—(1) When the commission has once established price controls on milk in a market area, does it have authority to terminate such controls without a written demand of a majority, in numbers and amount, of the milk producers in the area? (2) If so, does the law require a public hearing after notice and the taking of testimony before such an order is entered?

The first question must be answered in the affirmative. Apparently deeming it essential to the constitutional validity of the statute, the legislature made a long series of findings of fact as a premise for the enactment of the statute in which, after reciting certain practices found to exist, it declared—"because such practices amount to evils which menace the health, safety, and welfare of the people at large, this chapter is passed." Following the findings of fact, the legislature created a milk commission to be composed of three citizens not connected with the industry except as consumers, one representative of the state board of health, one representative of the department of agriculture, one dairy farmer, and one distributor of milk. It will be noted that the public rather than the industry is given control in representation on the commission.

Because of the rather loose use of the words "may" and "shall" in the phraseology of the statute, a casual reading thereof leaves

some doubt as to the extent of the commission's powers. No market area may be established and price controls imposed except upon petition of a "group of representative producers." Under the language of the statute the question arose as to whether, when such a petition is filed, the commission has authority to exercise any discretion in establishing or declining to establish a market area and imposing price controls. This question has been answered by the decision in Milk Commission v. Dade County Dairies, Inc. (Fla.), 200 So. 83, wherein the Court held at page 87 that the statute "leaves the discretion and determination of the necessity of the establishment of the control area entirely with the commission."

It will be noted that although an emergency was found to exist, although many facts were legislatively determined which, the legislature felt, made the enactment of the statute necessary in the *public* interest, the statute deemed necessary was not one which was self-executing and imposed price controls, but was one which *authorized* and *empowered* an *executive* agency of the state government, *in its discretion,* to establish price control areas and fix prices. It will also be noted that upon demand of a majority, in numbers and amount, of milk producers in any market area once established, the commission is required to withdraw price controls from such area.

The legislative intent in enacting a statute is the law. Did the legislature in adopting this statute, which was for the express purpose of protecting the public, intend to vest in the executive agency a discretion in establishing price controls, but no discretion in removing them? Did it intend that such discretion once exercised was thereby exhausted? Did it deem the *public* interest best protected by giving to the *industry* power to end controls—but denying such power to the executive agency representing the public?

It would require valid legislation in the most explicit language to cause the court to reach the conclusion that the representatives of the people in enacting a statute to protect the "health, safety and welfare of the people at large" intended that a commission established with power to exercise discretion in imposing price controls should be powerless to remove them; that a decision once made becomes irrevocable except upon the demand of the industry; that the industry acquires the sole power to determine what is best for the public.

On the contrary, the statute contains language amply sufficient to justify the conclusion that the legislature intended to vest in the commission discretion in removing controls at least equal to

its discretion in establishing them. It provides that the commission may—"Supervise and regulate the entire industry of the State of Florida, including the production, transportation, manufacture, storage, distribution, delivery and sale of milk, cream and milk products in any market established by the commission in the State of Florida; * * *" Sec. 501.04 (1). "Make, adopt and enforce all rules, regulations and orders necessary to carry out the purposes of this chapter; * * *" Sec. 501.04(9). "The operation and effect of any provision of this chapter conferring a general power upon the commission shall not be impaired or qualified by the granting to the commission by this chapter of a specific power or powers." Sec. 501.04 (11).

The commission was established to protect the interests of the public, the consumers, and the industry. In carrying out its duties, it has established market areas including many, but not all, of the counties of the state, and fixed prices in those areas. More recently, and in a year of unparalleled national prosperity, it has exercised its discretion to suspend, or temporarily revoke, its price-fixing orders, for the obvious purpose of determining by experience whether this industry cannot exist and operate successfully, in the traditionally American atmosphere of free competition. This is within the powers conferred upon the commission by the legislature.

Should there be grave doubt as to the legislative intent, two well established rules fortify the conclusion announced. A departmental construction of a statute is entitled to some weight in a judicial proceeding. When a statute is equally susceptible to two constructions, one of which renders it clearly constitutional and the other raises a serious question as to its constitutional validity, the former will be adopted. A construction of this statute which vests in the dairy industry the sole and executive power to determine when the public interest can best be served by the removal of price controls comes very close to a delegation of the powers of government to persons occupying no official position or office.

While of less importance to the parties, a more serious legal problem is presented by the second question stated above.

An executive agency may not act arbitrarily or capriciously. Those affected by decisions of such agencies, when vested interests are involved, have a right to be heard and even when vested interests are not involved statutes governing the actions of executive officers must be observed.

In the present case it could hardly be argued that the producers and distributors of milk have any vested interest in price controls,

but they do have the right to question whether the commission had authority to enter the challenged orders without conducting a formal hearing and receiving all proper evidence offered by interested parties. But, no vested interests being involved, such a hearing is necessary only if required by the statute.

The record shows that since the beginning of 1953 some 29 price-fixing orders have been entered, presumably after hearings as required by section 501.04 (9), and two other hearings have been conducted which did not result in price-fixing orders. It must be presumed, therefore, that the commission had before it ample evidence with respect to the economic condition of the industry, and its orders cannot be said to be without any basis in fact or to have been arbitrarily or capriciously entered. The action complained of was taken after a consideration of the matter in a regular meeting at which many producers and distributors were represented although no opportunity was afforded anyone to offer evidence and arguments were very limited.

The statute in section 501.04 (9) requires a hearing and investigation before the entry of an order fixing prices, but is silent as to proceedings preliminary to an order eliminating controls. No hearing is mandatory with respect to any order issued under authority of the language giving the commission authority to—"make, adopt and enforce all rules, regulations and orders necessary to carry out the purposes of this chapter." Milk Commission v. Dade County Dairies, Inc., supra.

As this court has construed the statute, one of its purposes is to authorize the commission, in the exercise of its discretion, to remove price controls when, in its discretion, the public welfare will be best served thereby. The orders complained of come within the quoted language and the court is of the opinion that no further hearing is required by the statute.

This conclusion is fortified by the obvious fact that the action of the commission is largely a question of public policy in the light of economic conditions in the industry, with which the commission was necessarily familiar, and the general economic condition of the state, with which the commission should be as familiar as the witnesses who might be brought before it. No hearing is provided for when the *industry* demands the removal of controls—the commission must accede to its demands. By natural corollary no hearing is necessary when, in the opinion of the commission, the public interest will be best served by the elimination of controls.

For these reasons the second question is answered in the negative.