MIAMI HOME MILK PRODUCERS ASSOCIATION v. MILK CONTROL BOARD.

169 So. 541

En Banc.

Opinion Filed July 16, 1936.

798

*McKay, Dixon & DeJarnette,* for Appellant;

*Lilburn R. Railey, Walsh, Beckham & Ellis, Cary D. Landis,* Attorney General, and *H. E. Carter* and *John L. Graham,* Assistant Attorneys General, for Appellee.

Brown, J.—The controlling question presented on this appeal is the constitutionality of Chapter 17,103 of the Laws of 1935, which legislative Act established, or in effect continued, the Milk Control Board which had been created by a similar statute, Chapter 16,078, adopted in 1933, the Board's existence under the present Act to expire June 30th, 1937.

The attack here made is centered on Section 13, the price-fixing section of the Act, which it is charged violates the due process and equal protection clauses of the Fourteenth Amendment to the Federal Constitution and certain similar

clauses (Sections 1 and 12) of the Declaration of Rights contained in our State Constitution.

This appeal is from a decree of the Circuit Court, in an injunction suit brought by the Milk Control Board, enjoining the defendant, appellant here, from violating certain orders of the Board by selling, or continuing to sell and deliver, fresh fluid milk at less price or on different terms or conditions than those fixed by the orders of said Board. The defendant in its answer admitted the facts alleged in the bill, and based its defense upon a denial of the legal existence of the Board and its power to make the orders which the defendant had violated. So there are here no disputed issues of fact which require discussion.

Section 1 of the Act under review reads as follows:

"Section 1. LEGISLATIVE FINDING: STATEMENT OF POLICY.—This Act is enacted in the exercise of the police power of the State, and its purposes generally are to protect the public health and public welfare. It is hereby declared that unhealthful, unfair, unjust, destructive, demoralizing and uneconomic trade practices have been and are now carried on in the production, sale and distribution of milk and milk products in this State, whereby the dairy industry in the State and the constant supply of pure milk to inhabitants of the State is imperiled. That such conditions constitute a menace to the health, welfare and reasonable comfort of the inhabitants of the State. That in order to protect the well being of our citizens and promote the public welfare, and in order to preserve the strength and vigor of the race, the production, transportation, manufacture, storage, distribution and sale of milk in the State of Florida is hereby declared to be a business affecting the public health and interest. That the production and distribution of milk is a paramount industry upon which the prosperity of the State

in large measure depends. That the present acute economic emergency, being in part the consequence of a severe and increasing disparity between the prices of milk and other commodities, which disparity has largely destroyed the purchasing power of milk producers for industrial products, has broken down the orderly production and marketing of milk and has seriously impaired the agricultural assets supporting the credit structure of the State and its local governmental subdivisions. That the danger to the public health and welfare is immediate and impending, the necessity urgent and such as will not admit of delay in public supervision and control in accord with proper standards of production, sanitation and marketing. The foregoing statements of fact, policy and application of this Act are hereby declared as a matter of Legislative determination."

None of the legislative determinations of the facts and circumstances existing at the time of the passage of the Act are denied by the appellant, nor was any effort made in the court below to disprove them. Such legislative ascertainments and determinations of facts, unless plainly contrary to those matters of common knowledge of which the courts may take judicial notice, are entitled to such weight as to require clear allegation and proof showing the contrary before the courts would be justified in overturning them, thus casting the burden of allegation and proof upon the party attacking such legislative determinations; it being the general rule that all reasonable presumptions will be indulged in favor of the constitutionality of a legislative Act. Jackson Lumber Co. v. Walton County, 95 Fla. 632, 116 So. 711; Maxcy v. Mayo, 103 Fla. 552, 139 So. 121. It is also well settled that a statute may be valid as applied to one state of facts, though under another factual status an application of the statute might violate rights secured by organic law. Seaboard Air Line Ry. Co. v. Robinson, 68

Fla. 407, 67 So. 139; Dutton Phosphate Co. v. Priest, 67 Fla. 370, 65 So. 282; Boynton v. State, 103 Fla. 1113, 138 So. 639.

In this connection, it might be well to quote here some of the allegations of the bill, which were not denied by the answer:

"That for some time prior to June 12th, 1933, the milk industry in the State of Florida had been in chaotic condition, with producers in many instances receiving less than the cost of production, with frequent price wars existing among the distributors, and with those engaged in the milk business facing financial loss and possible ruin, to the point of endangering a proper supply of pure and wholesome milk to be furnished and sold to the general public at a reasonable price. That efforts at private co-operation, regulation and control had proven entirely inadequate to permit proper and safe regulation of this industry in keeping with the welfare of the public and the needs of the people, and the dairy industry, to such an extent that relief from the Legislature to remedy such conditions were sought by a large number of reputable dairymen of the State engaged in the dairy business. As a result, there was introduced in the Legislature of Florida of 1933 a bill to provide such relief, which bill was duly referred to a legislative committee for hearing, study, investigation and report. That thereafter said legislative committee proceeded to make full and complete investigation, interviewing and taking testimony, evidence and information from various dairymen of the State and members of the public, for the purpose of ascertaining if such regulation was needed, and such bill was in the interest of public welfare, and if an emergency existed calling for the exercise of the police power of the State for the giving of relief to the dairy industry and to the public from such conditions. That as a result of such study,

hearing and investigation, the said Legislature of Florida in 1933 enacted Chapter 16078, Laws of Florida, of 1933, which was duly approved by the Governor June 12th, 1933, and thereafter became a law, in which Act and law was incorporated the legislative finding and statement of policy based upon such legislative investigation, study, finding and report as embodied in Section 1 of said Act.

"That pursuant to the terms of said Act, the Milk Control Board of the State of Florida was duly set up, organized and created, and has continued to function and exercise its power of authority as therein authorized, with great benefit and advantage to those engaged in the milk industry and to the general public by stabilizing conditions in the production and marketing of fresh fluid milk in this State.

"That by the terms of said Chapter 16078, Act of 1933, the authority of said Milk Control Board was due to expire and the said Milk Control Board was due to cease and come to an end June 30th, 1935, but prior to such time many dairymen of the State, as well as many members of the general public, realizing the need for the continuance of said law, and the beneficial effects which its regulation had brought about during its operation, and foreseeing confusion, chaos, and a return to the previous disturbing and unprofitable conditions of the industry prior to the adoption of said law, thereby creating an emergency, with resulting endangering of an adequate supply of pure and wholesome milk to the general public to be purchased at a reasonable price, with a corresponding adequate return to the producer and distributor of milk, based upon such emergency, again sought from the Legislature a continuation of the said Milk Control Board and of the law creating the same.

"That as a result thereof, there was introduced into the Legislature of 1935 an Act having for its purpose the continuation of the said Milk Control Board of the State of

Florida, and providing for the legal succession of the said Board created under the Act of 1933, by a similar Board, and providing further that all orders, rules and regulations of such Board created by the Act of 1933 should continue until otherwise changed or modified or created by the Board set up in such Act of 1935. That said Act of 1935, which is now known as Chapter 17103, General Laws of Florida, 1935, was duly referred to a legislative committee for the purpose of study, investigation and report. That pursuant thereto, such legislative committee made full investigation as to the needs of such legislation, interviewing and listening to the evidence and testimony of various dairymen in the State and to members of the public, and also investigating, studying and, considering the milk industry of the State, the existence of an emergency, and the need for such regulations to provide an adequate supply of pure and wholesome milk to the general public at a reasonable price. That as a result thereof, the Legislature arrived at a legislative finding of fact embodied in an Act which was duly enacted and is now known as Chapter 17103, General Laws of Florida, 1935, same being duly approved by the Governor on May 29, 1935, and filed in the office of the Secretary of State May 30th, 1935."

The bill also alleges in some detail the public hearings held by the Board, after notice given by publication, at which hearings the appellant was present, and the factual investigations and findings which were made by the Board, upon which the orders violated by the appellant, and which were made in accordance with the powers vested in the Board by the statute, were based.

It appears that the statute here in question was modelled quite closely upon the New York statute, the constitutionality of which was upheld by the Court of Appeals of the State of New York, and by the Supreme Court of the

United States, which affirmed the decision of the State Court, on March 5, 1934, in the Nebbia case. See Nebbia v. New York, 291 U. S. 502, 54 S. C. 505, 78 L. Ed. 94D, 89 A. L. R. 1469.

The price-fixing features of the New York statute were again considered and upheld in the case of Hegemen Farms Corp. v. Baldwin, 293 U. S. 163, 55 S. Ct. 7, 179 L. Ed. 259. Statutes substantially the same as the one here in question have been upheld in several well considered State court decisions, in which the Acts were held to be legitimate exercises of the State's police powers and not in conflict with either the Federal or State Constitutions, the latter containing provisions in their Constitutions similar to those in our own Declaration of Rights. The cases referred to are State Board of Milk Control v. Richmond Ice Cream Co. (N. J. Court of Chancery), 175 Atl. 796, decided in November, 1934; State, *ex rel.* State Board of Milk Control (N. J. Court of Errors and Appeals), 179 Atl. 116, decided in May, 1935; Reynolds v. Milk Commission of Virginia (Va. Supreme Court of Appeals), 179 S. E. 507, decided in March, 1935; Albert v. Milk Control Board (Ind. Supreme Court), 200 N. E. 688, decided March, 1936.

The case cited by Appellant, decided by the Superior Court of Pennsylvania in March, 1936, has been reversed within the past two weeks, and since the briefs were filed in this case, by the Supreme Court of that State, by a decision handed down on June 26th, 1936. The case referred to is Rohrer v. Milk Control Board, the opinions and decision of the Superior Court, holding the Milk Control Act unconstitutional, being reported in 121 Pa. 281, 184 Atl. 133; the decision of the Supreme Court reversing this holding, on the strength of the dissenting opinion written by President Judge Keller of the Superior Court, being as

yet unreported. There is contained in the majority opinion by Judge Parker and the dissenting opinion by President Judge Keller, of the Superior Court, a very able discussion of both sides of this question. The minority view of the Superior Court, holding the Act valid and constitutional, became the majority view of the higher court, the Supreme Court of Pennsylvania. Thus all the controlling decisions of the highest appellate courts, State and Federal, so far rendered, concerning the constitutionality of similar statutes, insofar as they have come to our attention are favorable to the validity of such statutes, and if followed by us would require the affirmance of the act. of the Dade County Circuit Court in holding the Florida statute valid.

The decision of the United States Supreme Court in Borden's Farm Products Co. v. Ten Eyck, reported in advance sheets of 80 L. Ed. 469, upholding the validity of a special provision of the New York Act, and the decision in Mayflowers Farms, Inc., v. Ten Eyck, advance sheets of 80 L. Ed. 475, striking down another special provision of the Act as later amended, denying the benefit of a certain differential to persons embarking in the business of milk dealers after the Act took effect, both decisions being handed down in February, 1936, are not material here. The Florida Act does not appear to contain these special provisions, and the questions discussed in those cases are not material to the attack here made on the power of the Legislature to authorize the Board, set up by the Act, to regulate milk prices as is attempted to be done by Section 13 of the Act.

This Court is not bound to follow the Supreme Court of the United States when construing the provisions of our State Constitution, but we are of course bound by the decisions of that eminent tribunal construing the meaning and effect of Acts of Congress and those provisions of the National Constitution which restrict the powers of the States.

And even in respect to those matters wherein this Court has not been compelled to abide by the decisions of the Federal Supreme Court, the decisions of that able and. eminent tribunal on questions analogous to those presented to this Court have always been considered as strongly persuasive and usually followed.

Accordingly, insofar as concerns the contention made by the appellant here that the provisions of the statute authorizing the Milk Control Board to regulate the maximum and minimum prices of fluid milk are in conflict with the due process and equal protection clauses of the Fourteenth Amendment to the Federal Constitution, we are bound to hold to the contrary on the binding authority of the decision of the Federal Supreme Court in Nebbia v. New York, *supra,* being based upon a similar statute and upon a similar factual status. It follows that as against the attacks here made, the emergency statute under review is not in conflict with the provisions of the Federal Constitution referred to.

It only remains to consider whether the Act violates the corresponding provisions contained in our State Constitution. The due process and equal protection clauses of the Fourteenth Amendment to the Federal Constitution above referred to read as follows:

"No State shall make or enforce any law which shall * * * deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

. The kindred provisions of our Florida Constitution, contained in Sections 1 and 12 of the "Declaration of Rights" read as follows:

"Section 1. All men are equal before the law and have certain inalienable rights, among which are those of enjoying

life and liberty, acquiring, possessing and protecting property, and pursuing happiness and obtaining safety."

"Section 12. No person shall be * * * deprived of life, liberty or property without due process of law, nor shall private property be taken without just compensation."

Our Declaration of Rights comprises 24 sections. Most of them have their roots deep in the past, and are the fruitage of centuries of struggle by our forefathers against the absolutism and oppression of the British crown.

In State, *ex rel.* Davis, Atty. Gen., v. City of Stuart, 97 Fla. 69, 120 So. 335, this Court said:

"These Declarations of Rights, those omitted as well as those above quoted, have cost much, and breathe the spirit of that sturdy and self-reliant philosophy of individualism which underlies and supports our entire system of government. No race of hothouse plants could ever have produced and compelled the recognition of such a stalwart set of basic principles, and no such race can preserve them. They say to arbitrary and autocratic power, from whatever official quarter it may advance to invade these vital rights of personal liberty and private property, 'thus far shalt thou come, but no farther.' They constitute a limitation upon the powers of each and all departments of the State government. Thus no department, not even the legislative, has unlimited power under our system of government."

But the word "liberty" as used in the Constitutions, both State and Federal, has never been understood to mean the absolute and unqualified right to do anything that the individual wants to do, regardless of the rights of his neighbor or of the general public. This would mean the end of all government and would lead to chaos and anarchy. Our forefathers were practical men, and they themselves never so understood it, nor did they ever intend that this sacred word should be confounded with the word "license." Volumes

have been written on this subject by publicists, statesmen and political economists, but after all it has necessarily been left to the courts, by the practical application throughout the years of these provisions of our Constitutions to statutes attempting to regulate the every day business and affairs of our citizens, after fair hearing to both sides of all controversies as they arose, to hammer out upon the anvil of common sense, logic and actual experience the meaning of the very general language contained in these brief yet highly significant provisions of our Constitutions.

Thus in the recent case of State, *ex rel.* Fulton, v. Ives, 123 Fla. 401, 167 So. 394, Mr. Presiding Justice ELLIS, writing the majority opinion, said:

"There is no controversy here, nor is there any doubt about the proposition, that the liberty of contract is not absolute and universal; that it is subject to the police power of the State to place restrictions upon it in the interest of the general welfare. There is no need to cite authority other than our own decisions upon this proposition. Everglades Sugar & Land Co. v. Bryan, 81 Fla. 75, 87 So. 68; State, *ex rel.* Davis, v. Rose, *supra;* Whitaker v. Parsons, 80 Fla. 352, 86 So. 247, 250."

And Mr. Chief Justice WHITFIELD, writing the majority opinion in the case of Whitaker v. Parsons, cited in the opinion just quoted from, wherein the compulsory cattle dipping law was held constitutional, used the following frequently quoted language:

"All governmental powers of the State are subject to the limitations imposed by the Constitution of the State and to applicable provisions of the Federal Constitution; the organic provisions being designed to secure all individual rights that are consistent with efficient government to conserve the general welfare. Individual rights to life, liberty and property are in law acquired and enjoyed, subject to the

exercise of the regulating powers of government; and such rights are not protected by the Constitution from the due exercise of such governing powers. * * *

"The State Constitution in its preamble declares that it is established "in order to secure" the "blessings" of "constitutional liberty," and in the Declaration of Rights ordains that "government is instituted for the protection, security and benefit of the citizens." As the powers of government operate upon persons and property, all personal and property rights are held subject to the due exercise of the sovereign governmental regulating power, therefore, considered in connection with the expressed purposes of the Constitution the organic provision that "all men are equal before the law and have certain inalienable rights among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and obtaining safety," does not confer upon individuals absolute or unlimited rights to life, liberty or property. The quoted organic provision does secure property rights against arbitrary and oppressive governmental invasion, but it does not protect personal or property rights from a due exercise of the governmental regulating power to which all individual rights are subject to accomplish the purposes for which the Constitution was established as the controlling law over all persons. The organic provisions requiring due process and equal protection of the laws in depriving individuals of life, liberty or property, expressly recognize that the right to protect life, liberty and property is not absolute, but that it is subject to restrictions that must necessarily be imposed by the lawmaking power, "in order to secure the blessings of constitutional liberty" in "maintaining public order," to "insure domestic tranquility," and "to promote the general welfare."

Insofar as Sections 1 and 12 of our Declaration of Rights

is concerned we might well rest our decision to affirm the decree of the court below upholding the constitutional validity of this confessedly emergency statute upon the general principles thus laid down by this Court in the case of Whitaker v. Parsons, just quoted from, construing the meaning of the applicable sections of the Declaration of Rights, and the recent Virginia, New Jersey, Indiana and Pennsylvania cases hereinabove cited, wherein similar legislation was upheld as against the charge of being in conflict with similar provisions in their respective State Constitutions. It is claimed that the opinion in the Virginia case (179 S. E. 507), which is an exceptionally able one, goes so far as to hold that the legislation there in question would have been constitutionally unobjectionable even if the Act had been framed as a permanent rather than as a temporary measure. But our Florida statute is by its express terms a temporary emergency Act, expiring on June 30th, 1937, and it is not necessary for us to decide whether, if such Act had been passed as a permanent expression of legislative policy, it could be upheld as constitutional. We will not attempt to cross bridges of that nature before we get to them.

This Court has heretofore recognized that the production and distribution of milk is subject to regulation under the police power. Logan v. Alfrieri, 110 Fla. 439, 148 So. 872; Anderson v. City of Tampa, 121 Fla. 670, 164 So. 546. In the case of Logan v. Alfrieri, Mr. Justice BUFORD, writing the opinion of the Court, said:

"It is well recognized throughout this and all other civilized countries that milk is a valuable and universal food product. That it is peculiarly liable and subject to contamination and adulteration. That the business of producing and distributing milk is one when improperly conducted or carelessly handled may seriously affect the public health. That in the interest of public health and safety,

the regulation of the production and distribution of milk is within the police power of the sovereignty and that strict and burdensome regulatory provisions may be enacted and enforced to guarantee to the consumer that protection which the sovereignty owes to him."

It is hardly necessary to discuss this question further, as practically every angle of the subject is brought out, and all the arguments for and against the constitutionality of Acts of this sort fully discussed, in the able majority and minority opinion in the Nebbia case and the several State cases above cited. We will therefore resist the temptation to write at length upon this very interesting question, suggesting as it does, in the field of political science and economy, the age-old conflict between liberty and authority, license and law, individualism and collectivism, and in the field of American constitutional law the difficult and delicate duties of the courts in their endeavors, largely by the slow but safe process of judicial exclusion and inclusion, to mark out the boundaries within which the police powers of our legislative bodies may properly be exercised without unjustly encroaching upon those basic personal and property rights of the individual citizen which are protected by our State and Federal Constitutions.

The outstanding cases decided by our Federal Supreme Court, dealing with the question of the power of a State to regulate prices in industries other than those usually classed as public utilities, are probably the following: Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 34 S. C. 612, 58 L. Ed. 1011; Wolff Packing Co. v. Kansas, 262 U. S. 522, 67 L. Ed. 1103; Tyson & Bros. v. Banton, 273 U. S. 418, 47 S. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236, and the Nebbia case, *supra*. The gist of the decision in the Nebbia case is

indicated by the third to eighth headnotes, which read as follows:

"3. A State statute establishing a milk control board with power to fix the minimum and maximum retail prices of milk, and making it unlawful for any milk dealer to sell or buy milk at a price less or more than that fixed by the board, enacted to remedy conditions of oversupply and destructive competition and low prices, which imperiled the State's milk supply and threatened the destruction or curtailment of the dairy industry, a paramount industry of the State, largely affecting the health and prosperity of its people, and an order of the milk control board fixing the price of 10 cents per quart for sales of milk by distributors to consumers and 9 cents per quart for sales by stores to consumers, are not unreasonable or arbitrary or without relation to the purpose of the Legislature, and so do not violate the due process clause of the Fourteenth Amendment.

"4. Neither property rights nor contract rights are absolute, and equally fundamental with either is the right of the public to regulate such rights in the common interest, subject to constitutional restraints.

"5. The Fifth and Fourteenth Amendments do not prohibit governmental regulation for the public welfare, but merely require that the end shall be accomplished by methods consistent with due process.

"6. The guaranty of due process demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained.

"7. The reasonableness, and hence the validity, of a regulation of a business, depends on the facts; and a regulation valid for one sort of business or in given circumstances may

be invalid for another business, or for the same business under other circumstances.

"8. Where an industry is subject to regulation in public interest, the due process clause does not prevent the State from correcting maladjustments by fixing the prices of products and commodities of the industry."

As above stated, the decision in the Nebbia case is binding on this Court insofar as it construes and applies the provisions of the Federal Constitution, and as to such provisions the Florida Milk Control Act is clearly immune to the attack here made upon it.

Appellant cites our recent decision in the case of State, *ex rel.* Fulton, v. Ives as authority for its attack upon the Milk Control Statute, but a reading of that case will show that it is not in point here. In that case we held that the Barber Board Act, which empowered the Board to fix a minimum scale of prices to be charged by barbers, by counties or in the State as a whole, was in conflict with the due process and equal protection clauses of the State and Federal Constitutions, but in the majority opinion by Mr. Presiding Justice ELLIS the Nebbia case was cited and differentiated. There we were dealing with an Act regulating a comparatively small group of our population, not a basic or paramount industry, and with the price to be charged by barbers for their personal services, not as here with the price of an essential commodity of almost universal consumption.

For the reasons above pointed out, the decree appealed from is hereby affirmed.

Affirmed.

WHITFIELD, C. J., and ELLIS, TERRELL and BUFORD, J. J., concur.

DAVIS, J., agrees to affirmance on authority of Nebbia case. 291 U. S. 502.