93 So.2d 354 (1957)
The STATE of Florida ex rel. Virgil D. HAWKINS, Relator,
v.
BOARD OF CONTROL, a body corporate, et al., Respondents.
Supreme Court of Florida, En Banc.
March 8, 1957.
*355 Horace E. Hill, Daytona Beach, and Robert L. Carter, New York City, for relator.
Richard W. Ervin, Atty. Gen., Ralph E. Odum, Asst. Atty. Gen., and John J. Blair, Sp. Asst. Atty. Gen., for respondents.
ROBERTS, Justice.
This litigation is concerned with the rights of the relator, a Negro, to be admitted to the University of Florida Law School, provided he meets the entrance requirements applicable to all students. The history of the litigation is set forth in State ex rel. Hawkins v. Board of Control, Fla. 1955, 83 So.2d 20, our latest decision in the controversy, referred to hereafter as the "1955 decision."
Our 1955 decision was entered in response to the mandate of the United States Supreme Court in State ex rel. Hawkins v. Board of Control, May 1954, 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112, directing this court to reconsider its decision in State ex rel. Hawkins v. Board of Control, Fla. 1952, 60 So.2d 162 (the "1952 decision" hereafter), "in the light of the Segregation Cases decided May 17, 1954, Brown v. Board of Education, etc. [347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 833] and conditions that now prevail." Since this court has held in a long line of decisions that it is bound by the decisions of the United States Supreme Court "construing the meaning and effect of acts of Congress and those provisions of the national Constitution which restrict the powers of the states," Miami Home Milk Producers Ass'n v. Milk Control Board, 1936, 124 Fla. 797, 169 So. 541, 544, we held in our 1955 decision, under the authority of Brown v. Board of Education, etc., supra, 347 U.S. 483, 74 S.Ct. 686, that the relator could not be denied admission to the University of Florida Law School solely because of his race. In the exercise of our discretion, however, we decided to withhold the issuance of a peremptory writ of mandamus in the cause, pending a subsequent determination of law and fact as to the time when the relator should be admitted to that institution; and the Honorable John A.H. Murphree, Resident Circuit Judge of the circuit in which the University is located, was appointed as the commissioner of this court to take testimony on behalf of the relator and the respondents, members of the Board of Control, relating to the factual issue. Our decision in this respect was based on two considerations, one a federal and the other a state ground: (1) the application to the controversy of the formula set out in the so-called "implementation decision," Brown v. Board of Education of Topeka, 349 U.S. 294, 295, 75 S.Ct. 753, 99 L.Ed. 1083; and (2) the exercise of our traditional power as a state court *356 to decline to issue the extraordinary writ of mandamus if to do so would tend to work a serious public mischief. City of Safety Harbor v. State, 1939, 136 Fla. 636, 187 So. 173, State ex rel. Carson v. Bateman, 131 Fla. 625, 180 So. 22; State ex rel. Gibson v. City of Lakeland, 126 Fla. 342, 171 So. 227; State ex rel. Bottome v. City of St. Petersburg, 126 Fla. 233, 170 So. 730.
The relator then filed a petition for certiorari in the United States Supreme Court to review our 1955 decision on the ground that the decision in the Brown case, 347 U.S. 483, 74 S.Ct. 686, did not apply to "State junior colleges, colleges, graduate and professional schools." The court disposed of this petition by a short but not entirely unambiguous opinion, dated March 12, 1956, 350 U.S. 413, 76 S.Ct. 464, 100 L.Ed. 486, reading as follows:
Per Curiam.
"The petition for certiorari is denied.
"On May 24, 1954, we issued a mandate in this case to the Supreme Court of Florida. 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112. We directed that the case be reconsidered in light of our decision in the Segregation Cases decided May 17, 1954, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. In doing so, we did not imply that decrees involving graduate study present the problems of public elementary and secondary schools. We had theretofore, in three cases, ordered the admission of Negro applicants to graduate schools without discrimination because of color. Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114; Sipuel v. Board of Regents of the University of Oklahoma, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247; cf. McLaurin v. Oklahoma State Regents for Higher Education, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149. Thus, our second decision in the Brown case, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, which implemented the earlier one, had no application to a case involving a Negro applying for admission to a state law school. Accordingly, the mandate of May 24, 1954, is recalled and is vacated. In lieu thereof, the following order is entered:
"Per Curiam: The petition for writ of certiorari is granted. The judgment is vacated and the case is remanded on the authority of the Segregation Cases decided May 17, 1954, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. As this case involves the admission of a Negro to a graduate professional school, there is no reason for delay. He is entitled to prompt admission under the rules and regulations applicable to other qualified candidates. Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114; Sipuel v. Board of Regents of the University of Oklahoma, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247; cf. McLaurin v. Oklahoma State Regents for Higher Education, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149."
The cause is now before this court on the relator's motion for a peremptory writ of mandamus to compel the respondents to admit him to the University of Florida Law School, his contention being that the above-quoted opinion entitles him to immediate admission, provided he is otherwise qualified, without regard to the outcome of the factual study which was in progress at the time of the filing of his motion and which has now been concluded.
There can be no doubt that, by revising its May 1954 mandate directed to our 1952 decision in the manner above noted, the Supreme Court of the United States neatly, albeit laconically, cut off the federal prop that supported, in part, our 1955 decision. But it will have been noted that *357 the opinion stated that "[t]he petition for certiorari is denied", presumably referring to our 1955 decision; and, this being so, our 1955 decision still stands, nonetheless firmly, on the state ground mentioned therein and referred to above.
Indeed, it is unthinkable that the Supreme Court of the United States would attempt to convert into a writ of right that which has for centuries at common law and in this state been considered a discretionary writ; nor can we conceive that that court would hold that the highest court of a sovereign state does not have the right to control the effective date of its own discretionary process. Yet, this would be the effect of the court's order, under the interpretation contended for by the relator. We will not assume that the court intended such a result.
In what appears to be a progressive disappearance of State sovereignty, it is interesting to read certain decisions (among others) which the United States Supreme Court has handed down in recent months. See: Railway Employees Dept. v. Hanson, 1956, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112, holding that a union shop agreement negotiated between certain railroads and certain organizations of employees of such railroads which had been authorized by an act of the Congress superseded the right-to-work provisions of the Constitution of the State of Nebraska and the state statutes enacted pursuant thereto; Rea v. United States of America, 1956, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233, holding that it was within the power of the federal courts to enjoin an officer of the executive department of the federal government from testifying in a state court in a case involving a violation of a criminal statute of that state; Commonwealth of Pennsylvania v. Nelson, 1956, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640, outlawing antisedition laws in 42 states, Alaska and Hawaii; Griffin v. People of State of Illinois, 1956, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, requiring the states to finance appeals by penniless persons convicted of crimes; Slochower v. Board of Higher Education of the City of New York, 1956, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692, limiting the power of states and cities to discharge public employees when they plead the Fifth Amendment against self-incrimination in duly authorized inquiries affecting the general welfare; Browder v. Gayle, D.C.M.D.Ala. 1956, 142 F. Supp. 707, affirmed by the Supreme Court, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114, holding invalid statutes and ordinances requiring the segregation of the white and colored races in motor buses operating in the City of Montgomery, Alabama.
It is a "consummation devoutly to be wished" that the concept of "states' rights" will not come to be of interest only to writers and students of history. Such concept is vital to the preservation of human liberties now. And whatever one's ideology may be  whether one is a strong defender of state sovereignty or an equally fervent advocate of centralized government  we think the great majority of persons would agree that if the death knell of this fundamental principle of Jeffersonian democracy is to be tolled, the bell should be rung by the people themselves as the Constitution contemplates. President Lincoln's words of warning are just as true today as they were almost a century ago, when he said in his first inaugural address on March 4, 1861:
"If the policy of the government upon vital questions affecting the whole people is to be irrevocably fixed by decisions of the Supreme Court * * * the people will have ceased to be their own rulers, having to that extent practically resigned their government into the hands of that eminent tribunal."
And we do not feel it is amiss to refer to the following remarks made by George Washington in his "Farewell Address":
"If, in the opinion of the people, the distribution or modification of the constitutional powers be in any particular wrong, let it be corrected by an amendment in the way which the Constitution designates. But let there be no change by usurpation; for though this, in one *358 instance, may be the instrument of good, it is the customary weapon by which free governments are destroyed."
But we repeat that, despite these recent decisions, we cannot attribute to the Supreme Court an intention to abrogate the rule which denies to federal courts the right to regulate or control long-established rules of practice and procedure adopted by state courts for the administration of justice therein. Cf. Naim v. Naim, 1956, 197 Va. 734, 90 S.E.2d 849, 850, in which the Supreme Court of Appeals of Virginia declined to remand a cause to a lower court, as directed by mandate of the United States Supreme Court, because to do so "would be contrary to [the] fixed rules of practice and procedure" of the Virginia courts, as well as the statute law of that state. A motion to recall the mandate and to set the case down for oral argument upon the merits, or in the alternative, to recall and amend the mandate was denied by the United States Supreme Court for the reason that the decision above referred to, 90 S.E.2d 849, "leaves the case devoid of a properly presented federal question." Ham Say Naim v. Naim, 1956, 350 U.S. 985, 76 S.Ct. 472, 100 L.Ed. 852. A fortiori, we cannot assume that the Supreme Court intended to deprive the highest court of an independent sovereign state of one of its traditional powers, that is, the right to exercise a sound judicial discretion as to the date of the issuance of its process in order to prevent a serious public mischief. As recently as June 4, 1956, in United Automobile, Aircraft and Agricultural Implement Workers of America v. Wisconsin Employment Relations Board, 351 U.S. 266, 76 S.Ct. 794, 799, 100 L.Ed. 1162, the Supreme Court recognized the "dominant interest" of a state in preventing violence. It there said: "The States are the natural guardians of the public against violence. It is the local communities that suffer most from the fear and loss occasioned by coercion and destruction. We would not interpret an act of Congress to leave them powerless to avert such emergencies without compelling directions to that effect." We are cognizant of our duty to compel relator's admission to the University of Florida Law School "without delay", if it is feasible to do so at this time; but we have an equally compelling duty to perform in respect to the public peace and a long-established state judicial procedure by which to perform it. We point out, additionally, that the relator, having a choice between a federal and a state court, selected this court as the forum in which to try his cause; he thereby selected the rules of practice and procedure long established in this jurisdiction. We have no doubt that the Supreme Court intended that we should adhere to such procedure in the instant controversy. The relator's contention in this respect cannot, therefore, be sustained.
We come now to the question of whether the facts, as developed under the guidance of this court's commissioner, require the immediate admission of the relator to the University of Florida Law School, provided he meets the entrance requirements. It might be noted that the relator had due notice and an opportunity to be heard at the hearings scheduled by the commissioner. He did not appear nor did he present any testimony in support of his right to immediate admission. Moreover, the history of this controversy leads us to believe that the relator does not, in fact, have a genuine interest in obtaining a legal education. He was given an opportunity to secure a legal education outside this state under the Regional Education Plan, but declined; he was given an opportunity to attend the University of Florida Law School, temporarily, if law facilities were not available at the Florida Agricultural & Mechanical University, but declined; he was then given an opportunity to attend the law school at the Florida Agricultural & Mechanical University, but declined. And, as noted, he was given an opportunity to appear before the court's commissioner and offer evidence in support of his right to immediate admission to the University of Florida Law School, but declined.
*359 It should be noted that the Law School at the University of Florida is an integral part of that institution. A law student is not in a class separate and apart from all other University students  he is a University student just as much as those entering the engineering school or the educational school or the architectural school, and entitled to participate in all campus activities.
Against this background, we have considered the evidence adduced by the respondents which, in the state of the record here, must constitute the basis for the exercise of our discretion in the matter. The factual material on file in this court reflects a prodigious amount of work by the commissioner and the respondents or those acting in their behalf. It is not contended  nor could it be  that there was even a modicum of bias on the part of any person involved in the work of assembling the data here presented nor in the formulation of the questionnaries which were the basic media by which much of the information was obtained. The survey is completely objective and as accurate and comprehensive as the time available for the study would permit. The testimony of the witnesses shows no bias and reflects only a sincere desire to do whatever is best for all concerned.
The survey conducted under the guidance of the court's commissioner shows, among others, that a substantial number of students and a substantial number of the parents of students state that they expect to take action  which apparently is positive action  to persuade Negro students to leave the University or make it so unpleasant for them that they will move out of a dormitory room or out of a class or out of a cafeteria or otherwise stop using the facilities of the University of Florida, should integration occur. It was also shown that 41 percent of the parents of students now in our white universities would cause them to drop out of those schools or transfer to another school; and that 62 percent of the parents of white 1956 high school graduates would send their children elsewhere than to our white state institutions, if we have enforced integration. There would be loss of revenue to our white institutions from grants, from activities on the part of the alumni of those institutions in support of their financial affairs, and from students moving out of dormitories (many of which are being paid for out of revenue certificates), if we have integration. Those institutions would lose the support of 52 percent of their alumni, if integration occurs, which would seriously impair the financial support to be expected from our state legislature. Integration would unquestionably result in the abandonment of substantially all of the graduate work now being offered at the Florida Agricultural & Mechanical University because it would be an unnecessary duplication of the same courses offered at the University of Florida or at Florida State University.
Our study of the results of the survey material to the question here, and other material evidence, leads inevitably to the conclusion that violence in university communities and a critical disruption of the university system would occur if Negro students are permitted to enter the state white universities at this time, including the Law School of the University of Florida, of which it is an integral part. This court has an opportunity to prevent the incidents of violence which are, even now, occurring in various parts of this country as a result of the states' efforts to enforce the Supreme Court's decision in the Brown case. We quote with approval that part of the language of Mr. Justice HOBSON in his special concurring opinion in which he said "the testimony which was taken at the direction of this court by the Honorable John A.H. Murphree, and which is now before us for consideration, was not in the record when the Supreme Court of the United States said `there is no reason for delay'. This testimony, as well as the revealing incidents (of which we may take judicial notice) which have occurred since the repudiation of the `separate but equal' doctrine, convinces me that the immediate *360 admission of relator to the University of Florida College of Law would result in great public mischief." The homely expression, "An ounce of prevention is worth a pound of cure," is especially applicable to the situation here  involving, as it does, the public welfare of all our people.
In the exercise of what we sincerely believe to be sound judicial discretion, we have decided that the relator's motion for a peremptory writ should be denied, but without prejudice to the right of relator to renew his motion when he is prepared to present testimony showing that his admission can be accomplished without doing great public mischief. For the reasons stated, the entry of a final judgment is deferred until further order of the court.
It is so ordered.
THORNAL and O'CONNELL, JJ., concur.
TERRELL, C.J., and HOBSON, J., concur specially.
THOMAS and DREW, JJ., dissent.
TERRELL, Chief Justice (concurring).
I concur in the opinion of Mr. Justice ROBERTS, particularly with that part relating to the power of this and other states to control their process when public mischief is imminent. This doctrine is all the more compelling when long-settled rules relating to the administration of justice and the prevention of violence are brought in question. Historically, individuals, as well as states, have interposed action to thwart the inroads of Federal authority not so much for delay as to preserve what was deemed to be the most precious of American ideals. In a free democracy the decisions of courts, even the Supreme Court of the United States, have never been considered sacrosanct or free from challenge.
In 1798 Jefferson and Madison on behalf of Virginia and Kentucky challenged the constitutional validity of the Federal sedition law. They contended that the law was not only unconstitutional, that it was in violation of the compact with the states and would continue so until effectuated by constitutional amendment. No attempt was made to force obedience on the part of Kentucky and Virginia but in 1801 Jefferson, author of the Kentucky resolution, was elected president of the United States.
In 1832, South Carolina nullified the Federal tariff act passed that year and nothing was done to force obedience but a new tariff act was passed forthwith. In 1838, the State of Georgia was ordered by the Supreme Court of the United States not to remove the Cherokee Indians beyond the state. [Cherokee Nation v. State of Georgia, 5 Pet. 1, 8 L.Ed. 25.] This was the famous case in which President Andrew Jackson injected himself into the picture and issued his famous pronouncement, "John Marshall has made his decision, now let him enforce it." The order was not obeyed. The State of Wisconsin refused to follow the order of the Supreme Court in the Dred Scott decision [Scott v. Sanford, 19 How. 393, 15 L.Ed. 691] promulgated prior to the Civil War. Georgia and Virginia have recently but respectfully declined to follow orders of the Supreme Court relying on control of their own process and the fact that there was still a modicum of sovereignty in the states that they had a right to invoke. In none of the foregoing incidents was any attempt made to coerce the states.
Some anthropologists and historians much better informed than I am point out that segregation is as old as the hills. The Egyptians practiced it on the Israelites; the Greeks did likewise for the barbarians; the Romans segregated the Syrians; the Chinese segregated all foreigners; segregation is said to have produced the caste system in India and Hitler practiced it in his Germany, but no one ever discovered *361 that it was in violation of due process until recently and to do so some of the same historians point out that the Supreme Court abandoned the Constitution, precedent and common sense and fortified its decision solely with the writings of Gunner Myrdal, a Scandinavian sociologist. What he knew about constitutional law we are not told nor have we been able to learn.
Such is in part the predicate on which the states are resisting integration. They contend that since the Supreme Court has tortured the Constitution, particularly the welfare clause, the interstate commerce clause, the Ninth and Tenth Amendments, the provisions relating to separation of state and federal powers, and the powers not specifically granted to the Federal government being reserved to states, they have a right to torture the court's decision. Whatever substance there may be to this contention, it is certain that forced integration is not the answer to the question. It is a challenge to freedom of action that is contrary to every democratic precept. It is certain that attempts at integration by court order have engendered more strife, tension, hatred and disorder than can be compensated for in generations of attempt on the part of those who are forward looking and want to do so. They have done more to break down progress and destroy good feeling and understanding between the races than anything that has taken place since emancipation. Social progress in any time is not measured by legislative acts and decree; it is measured by qualitative citizenship.
The seventeen states committed to segregation have the material stake in this question. They have spent billions on separate schools, hospitals and other institutions in the attempt to provide "separate but equal" facilities and opportunities for both races in reliance on what they understood to be the law. Violence has arisen everywhere and continues to arise account of attempts to comply with the Federal Courts' orders and the end is not yet. These "states are the natural guardians of the public against violence"; they know the reasons for it; they are fully aware that such tensions are grounded in the attempt of the Federal Courts at a form of enforced integration that is contrary to every precept that activates the need for law in this country.
Human nature may not be what it should be but such as it is, we are compelled to take it into account. The problem presented is more social than legal. In fact law is not the conclusive answer. Social advancement has never been measured by legal formulas and human nature has not reached the point where human ingenuity will not find a road to bypass laws and regulations which attempt to abrogate long-settled social standards. To be enforced in a democracy law must always follow and never precede a felt necessity for it. This was never better illustrated than by what is now being done to bypass Federal integration orders and what happened to national prohibition in the thirties. Surveys made in Washington City schools where integration has been attempted for at least two years also fortify this premise. If, as pointed out in the opinion of Mr. Justice ROBERTS, the Supreme Court of the United States recognizes that the "dominant interest" of the state is to prevent violence and the record here points the road to violence, that in itself is enough for this court to withhold the issuance of its mandate. The record is best fortified by what is or has been taking place in more than a half dozen states.
Then it has been revealed that these riots and outbreaks were not activated by local people but by interlopers from other places, in other words, social boll weevils, fruit flies, potato bugs, bean beetles, cane borers and other pests that we institute quarantines or other rigid measures against to get rid of. It takes time to do this and then it must be done by legal processes, otherwise we invoke that which is at least in the nature of the communist manifesto to enforce democratic processes. The problem is a different one in every state and in this state the governor and the educational *362 authorities are pursuing legal methods to solve the problem. After all is said the big question is not one of defying constituted authority, it is one of finding a way of solving a serious problem recently thrust upon the states with segregated schools and at the same time preserve their traditions, their moral, social, cultural and educational standards.
For the purpose of fortifying the premises discussed in the preceding paragraphs, it is pertinent to point out that the legislature on recommendation of the Fabisinski Committee, appointed by the governor, to recommend a method to best handle the segregation question in a legal way, has enacted Chapter 31380, Chapter 31389, Chapter 31390, and Chapter 31391, Acts of 1956, 2d Ex.Sess., F.S.A. §§ 230.231, 14.021, 14.022, 231.36. The first of this series of acts became effective July 26, 1956, and the other three became effective August 1, 1956. These acts, including those they amended, defined a complete scheme to administer the public school system. They were enacted under the police powers to promote the safety, health, order, welfare and education of the people within the State of Florida.
They also confer additional powers on the governor in that they authorize him to promulgate and enforce rules and regulations to protect the public against violence and property damages. They recognize that the state has the dominant interest in and is the natural guardian of the public against violence. It is perfectly evident that these acts had in view recent Federal decisions affecting segregation in that they authorized county boards of public instruction to choose personnel from all available sources, to consolidate school programs at any school center and to dismiss any teacher or teachers not essential to carry on the consolidated school program.
Another purpose of these acts was to preserve the welfare of all classes and by a system of uniform tests classify all school entrants according to intellectual ability and scholastic proficiency to the end that there will be established in each school within the county an environment of equality among those of like qualification and academic attainments. What effect, if any, the system so created will have on the case before us, I do not discuss. The point is that it expresses the public policy of the state as to the question. Those administering our educational program are moving as fast as consistent with wise judgment to set it up and other systems not materially different to protect the public from violence have been approved though they had little, if any, educational aspect. United Auto., Aircraft & A.I. Workers v. Wisconsin Employment Relations Board, 351 U.S. 266, 76 S.Ct. 794, 100 L.Ed. 1162; Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172.
These acts were passed since we last considered this case, they offer a sound and sensible basis to handle the school problem in Florida which was thrown into confusion overnight by Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, which in turn overthrew and kicked out the window the recognized school policy approved by all courts in the country for generations. The change has precipitated school problems peculiar to every state in the country. If Florida is not authorized to meet and solve the problem by which it is confronted in a sane and sensible manner, then all the law I have been taught governing state and Federal power has been pitched down the drain.
For these reasons I concur in the opinion of Mr. Justice ROBERTS.
HOBSON, Justice (concurring specially).
I concur in the conclusion reached by the majority because the testimony which was taken at the direction of this court by the Honorable John A.H. Murphree, and which is now before us for consideration, was not in the record when the Supreme *363 Court of the United States said "there is no reason for delay". This testimony, as well as the revealing incidents (of which we may take judicial notice) which have occurred since the repudiation of the "separate but equal" doctrine, convinces me that the immediate admission of relator to the University of Florida College of Law would result in great public mischief.
In the interest of both races, that is to say, the common weal, the writ of mandamus should, in the exercise of sound judicial discretion, be withheld until the Supreme Court of the United States in this case, after consideration of those matters which it has not heretofore had an opportunity to weigh and evaluate, unequivocally directs that relator be admitted to the College of Law at the University of Florida. In such event the onus will rest, as it should, with the tribunal responsible for the initial departure from a constitutional interpretation which had served us for so many years. And since I am bound by the paramount federal law, if such ruling should be made by a fully informed Supreme Court, I could not fail to comply without stultifying my oath of office.
THOMAS, Justice (dissenting).
After a careful examination of the opinion prepared for a majority of the court, I come to the conclusion that I must dissent.
It seems fitting, before recording my reasons for disagreement, to set out a chronology of the important steps in this protracted litigation.
On 30 May 1949 the relator filed in this court a petition for a writ of mandamus to command the respondents, members of the Board of Control and the president and the registrar of the University of Florida, to admit the petitioner, a Negro, to the college of law of the University. Adams, C.J., and Terrell, Sebring, Barns and Hobson, JJ., voted to issue an alternative writ of mandamus while Chapman, J., and the writer dissented on the ground that the petitioner had not first applied to the State Board of Education. The alternative writ, issued 10 June 1949, was in the usual form and commanded the respondents to admit the relator to the college of law or show cause 11 July 1949 why a peremptory writ should not follow.
From the answers, filed in response to the alternative writ of mandamus, it appeared that at the time of relator's application the college of law at the University of Florida was the only law school maintained in the state by taxes, and that relator had been informed that because there was no law school then functioning within the State where Negro students could be enrolled, the Board of Control was prepared to provide him, at a college or university acceptable to him in another state, courses of study as valuable as any offered in an institution of higher learning in Florida. At this time and for many years before the Florida Agricultural and Mechanical College staffed exclusively by Negroes and maintained exclusively for members of the Negro race, supported by State taxation, had been functioning in Tallahassee.
Attention was drawn to the laws of the state restricting courses at the University of Florida to members of the white race and the respondents asserted that in denying the relator's application they had not acted arbitrarily but had only obeyed the statute and the Constitution. It was provided in Section 228.09, Florida Statutes, F.S.A., that "schools for white children and the schools for negro children shall be conducted separately." Section 12 of Art. XII, of the Constitution, F.S.A., follows: "White and colored children shall not be taught in the same school, but impartial provision shall be made for both."
To repeat, it was in obedience to the statutory and constitutional inhibitions that the respondents declined to admit the relator to the college of law at the University *364 of Florida, and in order to afford him the training he desired they offered to secure him an education of equal quality at an institution outside the state where Negroes were not barred.
It was further represented that all state institutions of higher learning, including the University of Florida, and Florida Agricultural and Mechanical College  the name was changed to Florida Agricultural and Mechanical University by Chapter 27995, Laws of Florida, Acts of 1953, F.S.A. § 241.411  were managed and controlled by the Board of Control under the supervision of the State Board of Education and that from time to time, as the need arose, courses were added to the curricula of the institutions. Carrying out this policy, according to the answer, the Board of Control had, prior to the demand of relator, included in its budget requests for funds to be used in the establishment of a law school at Florida Agricultural and Mechanical College. As a conclusion the respondents stated that if the relator still refused "to accept out-of-state scholarship or other provision which may be made for his instruction in the courses he has requested elsewhere than at a State institution established for white students exclusively, and it should be held that said arrangement is insufficient to satisfy the relator's lawful demands, the respondent, Board of Control, has made provision for relator's immediate admission and enrollment" at the law school established at Florida Agricultural and Mechanical College. In the event the "necessary facilities, equipment and personnel for said course of study should not be immediately available" at Florida Agricultural and Mechanical College, continued respondents, the respondents had "made provision for [relator's] instruction * * * at the only other institution of higher learning in the State of Florida offering such course, until such time as adequate and comparable facilities and personnel * * * [could] be obtained and physically set up at Florida Agricultural and Mechanical College for Negroes, in Tallahassee, Florida."
The relator moved for a peremptory writ notwithstanding the answer.
The members of this court were in unanimous agreement that the entry of a final order should be withheld, and jurisdiction meanwhile retained, until the court should be satisfied either that the Board of Control had furnished, or failed to furnish, to the relator the opportunity, to pursue his desired course of study, substantially equal to the opportunity given students at other institutions supported by taxation. State ex rel. Hawkins v. Board of Control of Florida, Fla., 47 So.2d 608.
The relator moved again for a peremptory writ, 16 May 1951. State ex rel. Hawkins v. Board of Control, Fla., 53 So.2d 116, 119. This writ was denied, 15 June 1951, on the ground that the relator had not shown that he had exhausted all reasonable means of gaining admittance to the University of Florida. The order was entered without prejudice to the right to renew the motion for a peremptory writ when the relator could show that he had "brought himself within the principles enunciated in State ex rel. Hawkins v. Board of Control [Fla., 47 So.2d 608]."
The relator petitioned the Supreme Court of the United States to review the last order by certiorari but on 13 November 1951, that court declined because the judgment was not final. State of Florida ex. rel. Hawkins v. Board of Control of Florida, 342 U.S. 877, 72 S.Ct. 166, 96 L.Ed. 659.
On 7 June 1952 the relator presented his third motion for a peremptory writ. In an opinion of this court filed 1 August 1952, it was written that by making this motion the relator was taking the position that he would only enjoy the full political rights guaranteed by the Federal Constitution by being admitted to the University of Florida Law School, a school maintained *365 exclusively for white persons, even though a law school, exclusively for Negroes, supported by taxation was available to him. The court held, unanimously, that the motion should be denied and the alternative writ quashed. State ex rel. Hawkins v. Board of Control, Fla., 60 So.2d 162.
The Supreme Court of the United States granted certiorari to review this judgment, ordered the judgment vacated and remanded the cause to this court "for consideration in the light of the Segregation Cases decided May 17, 1954, Brown v. Board of Education, etc., 347 U.S. 483, 74 S.Ct. 686, and conditions that now prevail." The mandate was dated 24 May 1954. Florida ex rel. Hawkins v. Board of Control of Florida, 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112.
It should be remarked here that the case of Brown v. Board of Education, cited in the mandate, was one dealing with elementary schools while the present litigation involved a graduate school, and the direction that this court reconsider its judgment not only in the light of the cited case but also of "conditions that now prevail" was quite confusing, as will be emphasized when we advert to the decision in Brown v. Board of Education and allied decisions of the Supreme Court of the United States, and to a later mandate affecting the present litigation. (Italics supplied.)
In response to the mandate, this court entered its order 31 July 1954, directing the relator to amend his petition within 60 days so as to present the issues raised by the original petition "`in the light of the Segregation Cases * * * and conditions that now prevail'" and directing respondents within 30 days afterward to amend their return so that this court would be enabled to abide by the mandate.
In obedience to the order both petition and return were amended resulting in presentation of the single question "whether or not the relator [was] entitled to be admitted to the University of Florida Law School upon showing that he [had] met the routine entrance requirements." State of Florida ex rel. Hawkins v. Board of Control, Fla., 83 So.2d 20, 22. This opinion was filed 19 October 1955. So the issue was then narrowed to the one whether or not the relator's petition should be rejected because he was a member of the Negro race.
Meanwhile, between the time the pleadings were amended and the last cited decision was rendered, the Supreme Court of the United States entered its opinion, Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 implementing the decision in the case of Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180. In the `implementation decision' that court recognized that varied problems would exist locally the solution of which might require time and that school authorities should bear the burden of showing what delay was necessary "in the public interest and * * * consistent with good faith compliance at the earliest practicable date." Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 756.
So when the opinion of 19 October 1955 was filed by this court it was the majority view that, inasmuch as the mandate had referred to a case dealing with elementary schools, and the decision in that case had been implemented to permit some delay in meeting and solving problems, and this court had been directed to re-examine the decision in the present case in the light not only of that case but also in the light of "conditions that now prevail," a commissioner should be appointed to take testimony about local problems, and adjustments that would be necessary under conditions that prevailed, in order to admit the relator, and that upon such testimony the court would decide when a peremptory writ should issue. Four months from the date of the decision, 19 October 1955, was the period fixed for taking the testimony, *366 and before that time expired the period was extended to 31 May 1956.
A petition for certiorari to review the decision of 19 October 1955 was presented to the Supreme Court of the United States and that court, 12 March 1956, while the testimony being taken under the decision of 19 October 1955 was incomplete, entered a decision per curiam. [350 U.S. 413, 76 S.Ct. 464.] Some confusion resulted because the order began with the statement "The petition for certiorari is denied" and the concluding paragraph began with the statement "The petition for writ of certiorari is granted." The issuance of the mandate of 24 May 1954 was recited, then the court observed that it directed "the case be reconsidered in light of our decision in the Segregation Cases," but any reference to consideration of the matter "in the light of * * * conditions that now prevail" was omitted. Then the court explained that in directing this court to reconsider there was no implication that decrees affecting graduate students present the "problems of public elementary and secondary schools." To stress the point it was announced that in three cases: Sweatt v. Painter 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114; Sipuel v. Board of Regents of the University of Oklahoma, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247, Cf. McLaurin v. Oklahoma State Regents for Higher Education, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 the court had "ordered the admission of Negro applicants to graduate schools without discrimination because of color" and it was expressly stated that the `implementation decision' "had no application to a case involving a Negro applying for admission to a state law school." (Italics supplied.)
So the mandate of 24 May 1954 was recalled and the case remanded, "on the authority of the Segregation Cases decided May 17, 1954, Brown v. Board of Education, 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 833]." This is the now familiar decision dealing with elementary schools.
The judgment concluded with this significant language: "As this case involves the admission of a Negro to a graduate professional school, there is no reason for delay. He is entitled to prompt admission under the rules and regulations applicable to other qualified candidates." State ex rel. Hawkins v. Board of Control, 350 U.S. 413, 76 S.Ct. 464, 100 L.Ed. 486.
Despite the ambiguities which I have pointed out, I think, and I thought as early as 19 October 1955, when the decision of this court directing the taking of testimony was rendered, that the Supreme Court of the United States had, in effect, declared invalid the provision of the Constitution of the State of Florida in conflict with the interpretation that court had given the Constitution of the United States.
From the time of the decision in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, rendered in 1896, decisions by this court that white and colored students should be segregated but that the opportunities should be equal enabled members of this court to observe their personal oaths to support, protect and defend the Constitution of this state and do so in perfect harmony with rulings of the Supreme Court of the United States on the subject. The inhibition in the State Constitution is stated in clear, unambiguous language. Construing it verbatim brought no inconsistency with construction of the Constitution of the United States which contains no express language prohibiting segregation. In the recent decision overturning a precedent of 60 years, nobody seems ever to have bothered to consider the effect upon the oath of members of this court to support an absolute state constitutional inhibition of integration in schools in this state.
At the time of the rendition of the decision of 19 October 1955 I thought, despite the apparent ambiguity in the order on the first petition of certiorari, that no *367 further testimony with reference to prevailing conditions had been contemplated. Because of this view and the thought that no testimony was needed to dispose of the case, the issue having been reduced to the one whether a Negro could be barred simply by reason of his race, I thought the decision was wrong, so I dissented. And my conviction was buttressed by the understanding that the respondents had not requested the procedure, anyway.
My conclusion was confirmed by the entry of the second judgment. Even though there was a repeated reference to the Brown case, the language already quoted and then repeated dissipated any impression that there was occasion for further delay.
I cannot agree that when a decision denying a petition for mandamus is, in effect, reversed, the subordinate court retains the power to issue the writ at some later date. It is my view that in such case the discretion, held to have been abused, has been exhausted and the time has arrived to obey the mandate of the higher court.
It seems to me that if this court expects obedience to its mandates, it must be prepared immediately to obey mandates from a higher court. In this case when the Federal question was presented and determined by the Supreme Court of the United States, the ruling became binding upon this court at once regardless of our lack of sympathy with the holding.
Inasmuch as, to repeat, the Supreme Court of the United States has ruled that "there is no reason for delay" and that the relator "is entitled to prompt admission under the rules and regulations applicable to other qualified candidates" I think this litigation has ended and that the matter is now one purely of administration.
DREW, Justice (dissenting).
It is a fundamental truth that justice delayed is justice denied. This case has now reached the point where further delay will be tantamount to a denial of a constitutional right of relator.
Mr. Justice Sebring pointed out the course in his dissenting opinion in State ex rel. Hawkins v. Board of Control, Fla. 1955, 83 So.2d 20, 31, with which I must now agree. The Constitution of the United States of America, Article VI, provides that "`This Constitution * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" The oath of office I have taken requires that I "`support, protect and defend'" it. The Supreme Court of the United States has been established by long tradition as the final interpreter of the Constitution of the United States. Such an interpretation has been made in this case.
I cannot conclude that any discretion remains in this Court to lawfully postpone the issuance of a peremptory writ. That mandamus is a discretionary writ is academic, but that this broad principle is applicable in those cases where an authoritatively declared constitutional right is being denied  I cannot agree. See State ex rel. Beacham v. Wynn, 1946, 158 Fla. 182, 28 So.2d 253, 254 in which this Court said "where the right is indisputable there is no room for the exercise of discretion other than in keeping with the law." Also see Osborn v. Bank of United States, 1824, 9 Wheat. 738, 866, 22 U.S. 738, 866, 6 L.Ed. 204, 234.
Courts are the mere instruments of the law and can will nothing. Judicial discretion is a legal discretion. It is a discretion to be exercised in discerning the course prescribed by law. When, as here, that course has been discerned and a determination has been reached that relator is being denied his constitutional right, it is the clear duty of this Court to enforce the right. The power vested in the judiciary *368 should never be exercised for the sole purpose of giving effect to the will of the judge. The power we possess is for the purpose of giving effect to the will of the law. I conceive it to be my plain duty to give effect to the law which has been established by the United States Supreme Court.
I, therefore, respectfully dissent.